# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59647-4-II |
| Respondent, | |
| v. | |
| ALEXANDER RODRIGUEZ CRUZ, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, C.J. — Alexander Rodriguez Cruz appeals his convictions for three counts of rape of a child in the first degree and two counts of rape of a child in the third degree.

A trial court convicted Rodriguez[1] of raping his stepdaughters. On appeal, Rodriguez argues that (1) the trial court violated his right to present a defense by excluding evidence about the victims' history of lying, (2) his counsel rendered ineffective assistance by failing to object to testimony about times the victims disclosed the abuse to friends and family in the months and years before reporting the abuse to police, (3) the sentences for the third degree rape of a child convictions exceed the statutory maximum, and (4) the trial court imposed unlawful community custody conditions regarding geographic boundaries, Department of Corrections home visits, areas where children's activities regularly occur, and mental health treatment. Rodriguez also filed a statement of additional grounds (SAG). The State concedes that the rape of a child in the third

---

[1] We follow the defendant's preference for using only his first surname.

degree sentences exceed the statutory maximum, and that the trial court did not make required findings before imposing the community custody condition requiring a mental health evaluation.

We remand for the trial court to correct the community custody term for both rape of a child in the third degree counts to comply with the statutory maximum. On remand, the trial court should also reassess the community custody condition regarding mental health treatment. We otherwise affirm.

FACTS

ARR was born in 2004 and MRR was born in 2006. Their mother met Rodriguez in 2007 and married him in May 2008. Rodriguez was in the Army and was deployed to Korea and Afghanistan for large periods of time from 2008 to 2010. After returning from Afghanistan, Rodriguez was honorably discharged, and later diagnosed with severe posttraumatic stress disorder (PTSD). Rodriguez legally adopted ARR and MRR in 2020.[2] ARR and MRR shared a bedroom for most of their childhood.

In the fall of 2022, after moving out to go to college, ARR told an aunt that Rodriguez had sexually abused her, and she asked the aunt to notify the police. Soon after, MRR also reported that Rodriguez had sexually abused her.

The State charged Rodriguez with three counts of rape of a child in the first degree against ARR, one count of rape of a child in the third degree against ARR, two counts of rape of a child in the first degree against MRR, one count of rape of a child in the second degree against MRR, and one count of rape of a child in the third degree against MRR. The charging periods, when

---

[2] There was conflicting testimony at trial about whether ARR and MRR knew they were being adopted and how willingly they cooperated with the adoption process. The trial court found that this conflicting testimony negatively impacted the credibility of both their mother and Rodriguez.

combined, spanned from February 2009 to February 2020 for ARR, and from August 2009 to July 2021 for MRR. Rodriguez waived his right to a jury trial, and the case proceeded to a bench trial.

I.   TRIAL TESTIMONY

At trial, the parties stipulated that Rodriguez was never married to ARR or MRR, and that there was no contested issue regarding his age.

ARR and MRR each testified in detail about several occasions that Rodriguez touched their breasts and penetrated their vaginas with his fingers, usually in the middle of the night. ARR estimated that the abuse began when she was around 4 or 5 years old and occurred roughly twice a month until she was around 13. ARR testified that Rodriguez would usually assault her first, then move on to MRR.

MRR estimated that the abuse she experienced began at age 3 and ended at age 14. MRR testified that before the age of 10, the abuse occurred "close to every single night" but later decreased in frequency, although it still occurred "at least once a year" after she turned 10. 1 Rep. of Proc. (RP) at 115-16. She said that while the frequency of abuse varied, it would occur more often when her mother was away on business trips, the house was empty, or she was in trouble. MRR also stated that she would only wake up when Rodriguez began touching her, and that she did not know that ARR was also being abused until the sisters had a conversation about the abuse when MRR was in her mid-teens.

A.   Disclosures to Friends and Relatives

ARR, MRR, and several witnesses testified about occasions that each victim disclosed abuse during their teenage years.

ARR testified that when she was 13, she tried to tell her mother about the abuse. Specifically, after getting in a fight with Rodriguez, ARR yelled that Rodriguez was touching her

inappropriately. ARR said that her mother became "really mad," called her "a liar" and did not allow her to see a therapist. 1 RP at 40. MRR testified that her mother indirectly complained to her about ARR's allegation "in the middle of a rant. . . . She made a remark close to, 'Can you believe that,' but very quickly changed the subject and moved on without giving me a moment to respond." 1 RP at 127.

The victims' mother testified for the defense. She stated that ARR would regularly threaten to call Child Protective Services on Rodriguez when she was denied a request or "didn't like our parenting style." 3 RP at 414. The mother also testified that when ARR was in eighth grade, ARR got in a fight with Rodriguez and stormed into the house. Rodriguez then told the mother that ARR had threatened to tell people that he was touching ARR inappropriately. The mother testified that she sat ARR down "looking for details to understand what it is that she was claiming took place, and she just immediately started crying and really could not articulate what happened in any kind of a meaningful way. So the conversation really wasn't productive at that point." 3 RP at 409. The mother then stated that later that evening she asked MRR "if she had ever witnessed any inappropriate touching or conduct by her father," and that MRR denied experiencing abuse. 3 RP at 413.

First, ARR reported telling her boyfriend about the abuse without identifying the abuser while she still lived at home, and then later identifying Rodriguez as the abuser to her boyfriend in 2022. ARR's boyfriend testified that she first disclosed to him that she had experienced abuse in August or September 2020, without identifying the abuser. Then after ARR moved out to go to college in 2022, she told her boyfriend that Rodriguez was the abuser.

MRR testified that in December 2021, she told a friend about being sexually abused but lied about the perpetrator's identity because she did not want the friend to contact authorities. The

4

friend then testified that in December 2021, MRR told him she had been sexually abused by someone who was no longer in her life. When the friend asked if MRR's father had committed the abuse, MRR "broke down [crying] even more. She was, like, gasping, crying." 2 RP at 286. The friend stated that in early 2022 MRR told him that Rodriguez was the abuser.

The sisters' cousin also testified that ARR disclosed being abused and identified Rodriguez as her abuser in the fall of 2022. This cousin called Child Protective Services. ARR testified that she disclosed her abuse to the cousin shortly before telling the aunt who eventually called police. And that aunt testified that ARR informed her that Rodriguez had sexually abused both ARR and MRR. When the aunt later asked MRR if the allegations were true, "she shook her head yes and cried." 1 RP at 161. Each victim testified that they had told the aunt about the abuse.

B.      Testimony About ARR's and MRR's History of Lying

On cross-examination, defense counsel asked ARR about her history of skipping confirmation classes at church. ARR admitted that she and MRR agreed that they would not tell their parents about ARR skipping the classes.

The victims' mother described the charges against Rodriguez as ARR and MRR "being planful together." 3 RP at 307. She also testified that the sisters were supposed to attend confirmation classes at church together, but ARR would skip the classes. The State objected that the testimony was evidence of prior bad acts prohibited by ER 404(b). Defense counsel defended the line of questioning:

> [DEFENSE COUNSEL]: . . . [I]t will tie into what the defense theory is from October of 2022.
>      . . . .
> In the situation that I think that the witness is about to explain, . . . they were going to confirmation classes. [The parents] found out that [ARR] was not going to confirmation classes. [ARR] was in trouble. [MRR] apparently lied for [ARR] and said that, in fact, [ARR] had been attending confirmation classes.

There's a record for attendance at confirmation classes, and that is how [their mother] found out that that was not true.

THE COURT: Okay. . . . How is it relevant to the defense?

[DEFENSE COUNSEL]: We believe . . . that [ARR], when she made the allegation, reached out to [MRR] and that [MRR] backed up [ARR] in the story.

THE COURT: Isn't that character evidence in which you're arguing they acted in conformity therewith?

[DEFENSE COUNSEL]: It's a character trait. It may not—that particular instance would be a 404(b), yes, Your Honor.

THE COURT: Objection sustained. Ask another question.

3 RP at 404-05.

The mother then testified that ARR would cry "any time she was upset," angry, or confronted about wrongdoing. 3 RP at 410. The mother testified about a time ARR scratched a freshly-painted door, and, when confronted, began "crying and screaming." 3 RP at 411. The State again objected:

[PROSECUTOR]: Your Honor, objection to this. I think we are back into character evidence, past incident, acting in conformance with now.

[DEFENSE COUNSEL]: Your Honor, I do think it's a relevant character trait that [ARR], when confronted on something that she's not telling the truth, cries.

THE COURT: Okay. So 404(a) says you cannot admit evidence of a character trait to demonstrate that the person acted in conformity therewith. Isn't that—do I have that right?

. . . .

[DEFENSE COUNSEL]: That is the rule.

THE COURT: Isn't that what you're asking me to accept here[?]

. . . .

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: Okay. So the objection is sustained.

3 RP at 411-12. The mother then testified that it was common for ARR to cry when confronted. Defense counsel then asked if, when ARR threatened to call Child Protective Services on Rodriguez for sexually abusing her, ARR again "cried and did not answer your questions about what had happened." 3 RP at 412. The State again objected and the trial court sustained the objection.

6

On cross-examination, defense counsel elicited testimony from ARR and MRR that they felt deceived to learn that Rodriguez was not their biological father, and that they wanted their mother to divorce him. The sisters' mother testified that the sisters knew she was considering divorce as early as 2020, and that she had at one time complained to MRR about "wish[ing] that [she] had something that would force the divorce." 3 RP at 427.

Rodriguez testified that ARR was repeatedly caught lying, such as faking illness to stay home from school. And he said that ARR would regularly threaten to call Child Protective Services to report physical abuse if Rodriguez confiscated her phone or would not give her permission to go somewhere with friends. Rodriguez testified that he spoke to the victims' mother about ARR's threat to tell people he was sexually abusing ARR when she was thirteen because "the threats with [ARR were] escalating." 3 RP at 517.

### C. Closing Arguments

In its closing summation, the State argued that the victims were intelligent and sophisticated enough that "if they had come up with a plan, it would have been more concise than what their testimony indicated." Clerk's Papers (CP) at 52. The State also argued that the testimony from ARR's boyfriend and MRR's friend "corroborate[d] the victims' accounts," and that the timeline of the many "disclosures support[ed] their credibility." CP at 52-53.

Defense counsel argued in closing that the allegations were fabricated because the victims wanted their mother to divorce Rodriguez, so "[t]hey worked together and for a purpose" to "collude[]" to remove him from the family. CP at 26, 29.

## II. VERDICT AND SENTENCING

The trial court made an oral ruling and entered written findings of fact and conclusions of law. Overall, the trial court found that ARR and MRR were credible. However, the trial court

found that for three of the charges, ARR and MRR did not testify with enough detail for the court to convict Rodriguez. The trial court convicted Rodriguez of two counts rape of a child in the first degree of ARR, one count of rape of a child in the third degree of ARR, one count of rape of a child in the first degree of MRR, and one count of rape of a child in the third degree of MRR.

A presentencing report documented Rodriguez's PTSD symptoms, which he had been managing with therapy and medication. The report recommended that Rodriguez seek mental health treatment while incarcerated.

The trial court imposed an indeterminate sentence near the middle of the standard sentencing range of 275 months to life for each of the rape of a child in the first degree convictions. Those convictions also required the trial court to impose lifetime community custody.

The statutory maximum for the rape of a child in the third degree convictions was 60 months, and Rodriguez's high offender score from his many current convictions meant that the only sentence the trial court could impose within the standard range for those counts was 60 months. The trial court also imposed 36 months of community custody for each of those convictions.

The trial court imposed numerous community custody conditions. Standard condition 8 required Rodriguez to "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction Officer." CP at 100. Special condition 8 required Rodriguez to "[c]onsent to [Department] home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of residence in which the offender lives or has exclusive/joint control/access." CP at 100. And special condition 27 required Rodriguez to obtain a "mental health treatment assessment, and follow through with all recommendations of the provider, including taking medication as prescribed." CP at 101.

The trial court modified some of the preprinted conditions. In particular, special condition 19 prohibited Rodriguez from entering "where children's activities regularly occur or are occurring." CP at 101. This condition listed specific areas for Rodriguez to avoid, including shopping malls and "fast food restaurants (to include the drive-thrus) . . . and any specific location identified in advance" by the Department. CP at 101. The trial court added a written notation allowing this condition to be modified with approval from Rodriguez's sex offender treatment provider.

Rodriguez appeals his convictions and sentence.

ANALYSIS

As an initial matter, Rodriguez assigns error to numerous trial court findings, including the trial court's determinations that ARR and MRR were credible and that Rodriguez was not credible. But it is well established that "[c]redibility determinations are for the trier of fact and are not subject to review" on appeal. *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008). Rodriguez assigs error to other trial court findings that do not pertain to credibility—specifically, findings that ARR and MRR first discussed their abuse in vague terms with each other and that their mother did not believe ARR when she disclosed the abuse. In the body of his brief, Rodriguez cites contradictory evidence in the record to assert that these findings were not supported by substantial evidence. But "[t]he mere presence of contradictory evidence in the record does not render" a finding unsupported by substantial evidence. *PacifiCorp v. Wash. Utils. & Transp. Comm'n*, 194 Wn. App. 571, 598, 376 P.3d 389 (2016); *Schatz v. Dep't of Soc. & Health Servs.*, 178 Wn. App. 16, 25, 314 P.3d 406 (2013). Without more, Rodriguez's challenges to these findings fail.

I.      RIGHT TO PRESENT A DEFENSE

Rodriguez first argues that the trial court violated his right to present a defense by sustaining the State's objections to the mother's testimony about prior instances that ARR and MRR lied, and how ARR reacted when confronted with a lie.  Rodriguez reasons that the testimony was evidence of a pertinent character trait of the victims under ER 404(a), because the victims would "habitually coordinat[e] and cover[] for each other's lies" and ARR would cry when presented with evidence of her own dishonesty.  Br. of Appellant at 23.  He also contends that the testimony was admissible as evidence of a common scheme or plan under ER 404(b): "that the accusers coordinated to levy false allegations," and ARR's "strategic response to accusations of lying."  Br. of Appellant at 27, 29.  Rodriguez asserts that the evidence was highly relevant to his defense because the trial was a referendum on ARR's and MRR's credibility, so excluding the evidence prejudiced him.  We disagree.

A.      RAP 2.5

In a statement of additional authorities, the State argues that Rodriguez failed to preserve this argument because he did not assert below that the exclusion of the evidence violated his right to present a defense.

RAP 2.5(a) allows this court to "refuse to review any claim of error which was not raised in the trial court," with limited exceptions.  Relevant here, a party may raise a claim of a manifest error affecting a constitutional right for the first time on appeal.  RAP 2.5(a)(3).  "A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.  But an error is manifest only if it had practical and identifiable consequences at trial.  *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009).  "It is proper to 'preview' the

merits of the constitutional argument to determine whether it is likely to succeed" when determining whether a defendant has asserted a manifest error affecting a constitutional right. *State v. Kirwin*, 165 Wn.2d 818, 823, 203 P.3d 1044 (2009) (quoting *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)). We do so here.

"[T]he Constitution permits judges to 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Jennings*, 199 Wn.2d at 63 (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). Ordinarily, "[w]hen a criminal defendant claims an evidentiary ruling violated his or her right to present a defense, appellate courts engage in a two-part analysis." *State v. Restvedt*, 26 Wn. App. 2d 102, 123, 527 P.3d 171 (2023). We first review the trial court's evidentiary rulings for an abuse of discretion and then consider de novo whether these rulings violated the defendant's Sixth Amendment right to present a defense. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). We conduct the second step of the analysis even if we determine that the trial court's ruling was not an abuse of discretion. *See id.* at 812. Because we are merely previewing this issue to determine if a manifest error has occurred, because we conduct the second step of the analysis regardless of the outcome of the first step, and because Rodriguez failed to assign error solely to the trial court's evidentiary ruling—separate from his right to present a defense claim—we proceed directly to the second step of the analysis.

B.    Constitutional Right to Present a Defense

Rodriguez argues that the trial court violated his right to present a defense because there is a reasonable probability that the outcome of trial would have been different. He reasons that the "trial was a referendum" on the victims' credibility because their testimony was the only direct

evidence. Br. of Appellant at 33. "[T]he evidence would have assisted the factfinder in understanding the accusers' practiced methods of lying in specific ways, covering up for each other in specific ways, and responding to confrontation about inconsistencies in specific ways." Reply at 9. We disagree.

To determine if excluding evidence violated a defendant's right to present a defense, courts consider "(1) whether the excluded evidence was at least minimally relevant, (2) whether the evidence was 'so prejudicial as to disrupt the fairness of the factfinding process' at trial, and, if so, (3) whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it." *State v. Orn*, 197 Wn.2d 343, 353, 482 P.3d 913 (2021) (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)).

"[C]ourts focus on whether the particular evidence at issue [was] a defendant's entire defense." *Restvedt*, 26 Wn. App. 2d at 123. "In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment'" and article I, section 22 of the Washington Constitution. *Arndt*, 194 Wn.2d at 812 (quoting *Hudlow,* 99 Wn.2d at 16). But the Supreme Court has held that excluding evidence did not violate a defendant's right to present a defense when the "proffered evidence was not excluded entirely" and a witness was able to testify at length in support of the defense theory of the case. *Arndt*, 194 Wn.2d at 813.

Here, there was extensive evidence admitted to support Rodriguez's theory that the victims were habitual liars who fabricated the allegations. First, defense counsel cross-examined ARR, and pursuant to cross-examination she testified about her history of skipping confirmation classes, and her agreement with MRR to hide ARR's absences from their parents. Next, the victims' mother explained that she did not believe ARR's initial disclosure at age 13 because ARR burst

into tears and would not communicate any details. She also stated that she viewed the current allegations as ARR and MRR "being planful together." 3 RP at 307. Rodriguez testified that ARR was repeatedly caught lying, skipping school, and breaking family rules. And both Rodriguez and the victims' mother testified that ARR would regularly threaten to call Child Protective Services on Rodriguez when parenting rules were enforced or ARR was denied something that she wanted.

Overall, there was a significant amount of evidence impinging on the victims' credibility that the trial court considered. And the properly admitted evidence was far more relevant to whether ARR and MRR fabricated their allegations of sexual abuse than testimony about individual instances of ARR skipping church classes and crying because she was caught scratching paint. *Arndt*, 194 Wn.2d at 813. As a result, the trial court did not violate Rodriguez's right to present a defense by excluding the mother's testimony about specific instances of lying when there was abundant other evidence presented in support of his theory of the case. Accordingly, there exists no manifest error affecting a constitutional right, so we do not review this issue.[3] *Kirwin*, 165 Wn.2d at 823.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Rodriguez next argues that he received ineffective assistance of counsel because trial counsel did not object to hearsay evidence. Specifically, he argues that counsel should have objected to testimony from the victims' friends, cousin, and aunt about the victims disclosing sexual abuse. Rodriguez reasons that the testimony exceeded that allowed by the fact of the complaint doctrine because the disclosures were all untimely, and the victims identified Rodriguez

---

[3] To the extent that Rodriguez challenges the trial court's findings that ARR was emotional during her testimony, that ARR and MRR were credible, and that Rodriguez was not credible these findings were clearly determinations that this court cannot review on appeal. *Mines*, 163 Wn.2d at 391.

as the perpetrator in some disclosures. Rodriguez contends that the failure to object prejudiced him because the State argued that the disclosure witnesses corroborated the victims' testimony and the court found that the disclosure witnesses were credible. We disagree.

We first note that Rodriguez appears to argue that the fact of the complaint doctrine should not apply to bench trials. But the rules of evidence do not cease to apply simply because the trier of fact in a bench trial is more familiar with those rules, and the reasons behind them, than a jury.

A.    Legal Principles

1.    Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 22 to the Washington Constitution both guarantee criminal defendants the right to effective assistance of counsel. A "defendant must show both (1) deficient performance and (2) resulting prejudice to prevail on an ineffective assistance claim." *State v. Estes*, 188 Wn.2d 450, 457-58, 395 P.3d 1045 (2017). "If either element of the test is not satisfied, the inquiry ends." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Counsel's performance is deficient if counsel's conduct falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Courts "indulge a strong presumption that counsel's representation was reasonable." *Estes*, 188 Wn.2d at 458. "The defendant has the burden to show that defense counsel's performance was deficient based on the trial court record." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "Performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics." *Estes*, 188 Wn.2d at 458.

"A classic example of trial tactics is when and how an attorney makes the decision to object during trial testimony." *Vazquez*, 198 Wn.2d at 248. "When a defendant bases his ineffective

assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). "'Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *Vazquez*, 198 Wn.2d at 248 (quoting *Crow*, 8 Wn. App. 2d at 508).

"The prejudice prong requires the defendant to prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862. "A defendant must *affirmatively prove prejudice,* not simply show that 'the errors had some conceivable effect on the outcome.'" *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). In other words, a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Estes*, 188 Wn.2d at 458.

### 2.     Fact of the Complaint Doctrine

The fact of the complaint doctrine has its origins in combating the ancient myth that a sexual assault victim must raise a "hue and cry" shortly after the assault in order for their story to be found credible. *State v. Martinez*, 196 Wn.2d 605, 609-10, 476 P.3d 189 (2020). The current manifestation of the doctrine allows the State to introduce evidence of a timely complaint about sexual assault "in its case in chief to negate any inference that because the victim had failed to tell anyone she had been sexually assaulted, her later claim could not be believed." *Id.* at 610. "Testimony under the doctrine is not admissible for the truth of the matter asserted, only to demonstrate that the victim reported to someone." *Id.* at 611. "Witnesses may give sufficient details 'to identify the nature of the offense of which complaint was made,' but details such as

identity of the perpetrator are not admissible." *Id.* (quoting *State v. Goebel*, 40 Wn.2d 18, 25, 240 P.2d 251 (1952)).

"Child abuse is not a set of multiple discrete acts; it is an ongoing pattern and practice." *Martinez*, 196 Wn.2d at 615. Accordingly, "[t]rial judges have discretion to admit evidence explaining why a victim waited to report facts of sexual violence, and other circumstances, in deciding whether or not to admit fact of the complaint testimony." *Id.* "A complaint is timely if it is made when there is an 'opportunity to complain.'" *Id.* at 614 (internal quotation marks omitted) (quoting *State v. Griffin*, 43 Wash. 591, 597, 86 P. 951 (1906)). And the Supreme Court has held that a trial court did not abuse its discretion by allowing four different witnesses to testify about a single victim's complaints, all made while the abuse was ongoing, even though the reports were made after the charging period ended. *Martinez*, 196 Wn.2d at 615.

B.      Analysis

Four witnesses testified about disclosures in this case: ARR's boyfriend, MRR's friend, and the sisters' cousin and aunt. ARR's boyfriend and MRR's friend learned that the sisters had experienced sexual abuse in 2020 and 2021. And all four witnesses learned that Rodriguez had been perpetrating the sexual abuse shortly before the victims reported the abuse to authorities in the fall of 2022.

First, Rodriguez insists that all these disclosures were untimely "because they occurred well after the accusers first had an 'opportunity to complain'" in 2017, when 13-year-old ARR threatened to call Child Protective Services on Rodriguez for sexually abusing her. Br. of Appellant at 47 (quoting *Martinez*, 196 Wn.2d at 614).[4]

---

[4] Rodriguez challenges a trial court finding that the mother did not believe ARR, but this finding was clearly supported by substantial evidence because the mother testified at trial that she did not believe the victims' claims.

ARR disclosed the abuse to her boyfriend in the summer of 2020, less than six months after the end of the relevant charging period. And MRR disclosed her abuse to a friend in December 2021, also within six months of the end of the charging period for the abuse she suffered. Judging whether a disclosure was timely can be complicated, and it is not apparent that a trial court would have sustained an objection to disclosures that came so close in time after the end of the abuse. *See Martinez*, 196 Wn.2d at 614-15. Moreover, Rodriguez was not identified as the abuser in either of these conversations, so these statements were, at the very least, not clearly inadmissible under the fact of the complaint doctrine. *Id.* at 611. Trial counsel did not perform deficiently by deciding not to object to testimony about these disclosures. *Vazquez*, 198 Wn.2d at 248.

We disagree with Rodriguez's implied suggestion that *only* a first attempted disclosure to someone who *did not believe the victims* is timely, and all later disclosures must therefore be untimely. ARR's later disclosures that occurred soon after she left the household to attend college can be considered timely because it was only after she left the household that she was free from any direct pressure by Rodriguez and her mother that would suppress disclosure. In any event, had defense counsel objected, the State could have argued that the statements were admissible to rebut Rodriguez's theory that the victims had fabricated the abuse to force their mother to divorce him. *See, e.g.*, ER 801(d)(1); *Martinez*, 196 Wn.2d at 627 (Gordon McCloud, J., dissenting); *Peralta v. State*, 191 Wn. App. 931, 952-53, 366 P.3d 45 (2015) ("When the conditions of ER 801(d)(1)(ii) are present and the witness's prior consistent statements were made before the date of facts from which the motive to falsify can be inferred, the prior consistent statement is relevant and may be admitted."), *rev'd on other grounds*, 187 Wn.2d 888, 389 P.3d 596 (2017). And an evidentiary error "is not reversible when the evidence was admissible on other grounds supported by the record." *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 760, 294 P.3d 857 (2013).

Rodriguez insists that his theory at trial was that the victims fabricated allegations of abuse as early as 2017, and that this prevented the statements from being admissible to rebut a charge of "recent fabrication" under ER 801(d)(1)(ii). Reply at 18. But the precise theory Rodriguez espoused at trial was that the victims invented the allegations to force their mother to pursue a divorce after they learned Rodriguez was not their biological father during the adoption in 2020, which was a charge of "improper . . . motive" that ER 801(d)(1)(ii) would have allowed the testimony to rebut.

Finally, Rodriguez argues that the specific fact of the complaint doctrine should have controlled over the general ER 801(d)(1)(ii) to exclude the statements. It is difficult to predict how a trial court would have assessed this argument, because without a defense objection, the State did not have to argue for ER 801 admissibility in the first place, and likewise had no opportunity to respond to this theory raised for the first time in Rodriguez's reply brief. But in any event, while these statements were important corroborating evidence, they were not "central to the State's case" because the testimony did not affect the direct evidence—ARR's and MRR's testimony about the specific incidents of abuse they suffered—that the trial court relied on to convict Rodrigeuz. *Vazquez*, 198 Wn.2d at 268-69.

As a result, Rodriguez both fails to show that an objection to the statements was likely to succeed, and that the statements were sufficiently central to the State's case that a failure to object fell below an objective standard of reasonableness. *Vazquez*, 198 Wn.2d at 268; *Crow*, 8 Wn. App. 2d at 508. Accordingly, we hold that trial counsel's failure to object to the testimony did not constitute deficient performance. *McFarland*, 127 Wn.2d at 334-35. Because Rodriguez fails to show that trial counsel performed deficiently, we need not reach prejudice. *Kyllo*, 166 Wn.2d at 862. Thus, the ineffective assistance of counsel claim fails.

III.    SAG

In his SAG, Rodriguez raises claims already addressed by counsel. He argues that the trial court violated his "right to present a defense by excluding evidence of [his] accuser's history and methods of lying," referring specifically to testimony from ARR and MRR's mother about prior incidents of lying. SAG at 1. He points to conflicting or confusing testimony about whether ARR and MRR knew they were being adopted, when the abuse began, and how regularly abuse occurred, as evidence that the victims lacked credibility. We have already held Rodriguez has not established a manifest error regarding this issue. Rodriguez's SAG claims fail.

IV.    STATUTORY MAXIMUM FOR RAPE OF A CHILD IN THE THIRD DEGREE

Rodriguez argues, and the State concedes, that the sentences for the rape of a child in the third degree convictions exceed the statutory maximum.

Rape of a child in the third degree is a class C felony. RCW 9A.44.079(2). Accordingly, the maximum sentence for that offense is 60 months. RCW 9A.20.021(1)(c). And RCW 9.94A.701(1) requires courts to impose 36 months of community custody for sex offenses. The statute also provides: "The term of community custody specified by this section shall be reduced by the court whenever an offender's standard sentence range term of confinement in combination with the term of community custody exceeds the statutory maximum for the crime." RCW 9.94A.701(10).

Here, Rodriguez's many current offenses meant that his offender score was 9 points—the maximum possible. Accordingly, the only term of confinement within the standard sentencing range that the trial court could impose for the rape of a child in the third degree convictions was 60 months. The trial court then imposed 36 months of community custody for each of those convictions. Thus, the total sentences for those two counts clearly exceed the statutory maximum.

We accept the State's concession. We remand for the trial court to strike the community custody terms for each of Rodriguez's convictions for rape of a child in the third degree in compliance with RCW 9.94A.701(10).

V.     COMMUNITY CUSTODY CONDITIONS

Rodriguez argues that the trial court unlawfully imposed several community custody conditions.

"We review community custody conditions for abuse of discretion." *State v. Johnson*, 197 Wn.2d 740, 744, 487 P.3d 893 (2021). A trial court abuses its discretion if it exercises its discretion on untenable grounds, such as by imposing an unconstitutional community custody condition. *Id*. Trial courts have statutory authority to impose community custody conditions that are crime-related, meaning that the conditions "prohibit[] conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10); *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015).

A.     Geographic Boundaries

Rodriguez argues that standard condition 8, which requires him to "[r]emain within geographic boundaries, as set forth in writing by the Department of Correction Officer" is unconstitutionally vague. Br. of Appellant at 67. We disagree.

A community custody condition is unconstitutionally vague if "(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement." *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018).

This court recently upheld a community custody condition requiring a defendant to "'[r]emain within geographic boundary, as set forth in writing by the Community Corrections

20

Officer.'" *State v. Cobb*, 36 Wn. App. 2d 382, 383, 584 P.3d 420 (2026). Specifically, we explained that the condition complied with statutes requiring the Department of Corrections "to set geographic restrictions for people it supervises based on an assessment of the person's risk to community safety" *Id*. at 385. "Additionally, this community custody condition contemplates that the defendant will have sufficient notice of what the geographic boundaries are, and this clarity also protects against arbitrary enforcement." *Id.* Thus, this court held that the condition was not unconstitutionally vague. *Id.*

The phrasing of the condition at issue in this case was functionally identical to the condition in *Cobb*. We agree with, and follow, *Cobb* to hold that the geographic boundary condition is not unconstitutionally vague.

B.      Department Home Visits

Special condition 8 required Rodriguez to "[c]onsent to [Department] home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of residence in which the offender lives or has exclusive/joint control/access." CP at 100. Rodriguez argues that this condition violates article I, section 7 of the Washington Constitution because it allows searches without reasonable cause. The State responds that because Rodriguez is still incarcerated, his challenge to this condition is not ripe for review. We agree with the State.

This court has recently reviewed a similar community custody condition when the defendant had been serving community custody for nearly a decade and had been subject to several searches. *State v. Haas*, 36 Wn. App. 2d 656, 586 P.3d 645 (2026). But a preenforcement challenge to a community custody condition is ripe for review only "when 'the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'"

*State v. Nelson*, 4 Wn.3d 482, 494, 565 P.3d 906 (2025) (internal quotation marks omitted) (quoting *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015)). "Finally, we must consider the hardship to the petitioners if we refused to review their challenge on direct appeal." *State v. Sanchez Valencia*, 169 Wn.2d 782, 789, 239 P.3d 1059 (2010).

The Supreme Court has held that a preenforcement challenge to a functionally identical condition regarding Department home visits to monitor compliance with supervision was not ripe. *Cates*, 183 Wn.2d at 533. The condition in *Cates* "did not authorize any searches, and it was expressly limited to monitoring the defendant's compliance with his supervision." *Nelson*, 4 Wn.3d at 494 (discussing *Cates*). In other words, conditions to monitor a defendant's compliance with other conditions are facially valid, so further factual development is required to determine if the circumstances of enforcement of those conditions are unreasonable or unconstitutional. *Id.* at 497.

Additionally, "[s]ome future misapplication of the community custody condition might violate article I, section 7, but that 'depends on the particular circumstances of the attempted enforcement.'" *Cates*, 183 Wn.2d at 535 (quoting *Sanchez Valencia,* 169 Wn.2d at 789). Because complying with the condition did not require the defendant "to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit," he did not suffer a significant risk of hardship that required preenforcement review. *Cates*, 183 Wn.2d at 536.

*Nelson* and *Cates* control. Because special condition 8 was "included to help monitor compliance with other validly imposed conditions," such as prohibitions on possessing sexually explicit materials, the challenge to the condition "requires further factual development to determine if the circumstances of enforcement . . . are unreasonable." *Nelson*, 4 Wn.3d at 497. And because the condition does not require Rodriguez to affirmatively do or refrain from doing

anything until the Department attempts to conduct a home visit, there is no risk of hardship from denying preenforcement review. *Cates*, 183 Wn.2d at 536. Accordingly, we hold that Rodriguez's challenge to this condition is not ripe for review.

C.      Areas Where Children's Activities Regularly Occur

Special condition 19 prohibited Rodriguez from entering "where children's activities regularly occur or are occurring." CP at 101. It then provided a list of examples including shopping malls and "fast food restaurants (to include the drive-thrus) . . . and any specific location identified in advance" by the Department. CP at 101. The trial court added a notation allowing this condition to be modified by Rodriguez's sex offender treatment provider.

Rodriguez argues that the condition is unconstitutionally overbroad. He reasons that because the condition prohibits him "from conducting any personal business or meeting other adults at shopping malls and fast-food restaurants," it "prohibits constitutionally protected activity and is far broader than necessary to protect the public." Br. of Appellant at 71. Thus, he requests that we strike the prohibitions on visiting shopping malls and fast food restaurants from the condition.

"The line between vagueness and overbreadth is not always clear." *State v. J.H.-M.*, 4 Wn.3d 648, 654, 566 P.3d 847 (2025). Numerous courts have upheld similar conditions against constitutional vagueness challenges. *State v. Wallmuller*, 194 Wn.2d 234, 241-43, 449 P.3d 619 (2019) (listing cases). But Rodriguez specifically confines his argument to an overbreadth challenge.

"'A clear and precise enactment may nevertheless be overbroad if in its reach it prohibits constitutionally protected conduct.'" *In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 67, 469 P.3d 322 (2020) (internal quotation marks omitted) (quoting *Grayned v. City of Rockford*, 408 U.S.

104, 114, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)), *abrogated on other grounds by J.H.-M.*, 4 Wn.3d 648. A defendant's usual constitutional rights are subject to infringements authorized by the Sentencing Reform Act of 1981, chapter 9.94A RCW, when the defendant is serving community custody. *State v. Hearn*, 131 Wn. App. 601, 607, 128 P.3d 139 (2006). "RCW 9.94A.010 describes the purposes of the SRA. Most relevant to community custody are the purposes of protecting the public, offering the offender an opportunity to improve himself or herself, making frugal use of government resources, and reducing the risk of reoffending." *Sickels*, 14 Wn. App. 2d at 70-71.

Relevant here, "[f]reedom of association may be restricted if imposed sensitively and if the restriction is reasonably necessary to accomplish the essential needs of the state and public order." *Hearn*, 131 Wn. App. at 607. Rodriguez repeatedly raped his stepdaughters over the course of their entire childhoods. Given that his offenses involved children who he was able to acquire a position of trust over, it is reasonable to prohibit him from frequenting places where children are commonly present or likely to be employed. And Rodriguez does not identify any constitutionally protected conduct that can occur *only* at shopping malls and fast food restaurants, but not other locations less likely to contain minors.

In his reply, Rodriguez insists that, by implication, he is likewise barred "from every retail store, gas station, car mechanic, grocery store, or restaurant—all places where teenagers might work—for life." Reply at 32. This claim ignores that the Department must identify in advance any prohibited locations besides those already listed in the condition. Additionally, the trial court expressly allowed modification of this condition with the approval of Rodriguez's sex offender treatment provider.

In sum, we hold that the prohibition on visiting shopping malls and fast food restaurants is not unconstitutionally overbroad.

D.     Mental Health Treatment

Special condition 27 requires Rodriguez to obtain a mental health evaluation and follow any treatment recommendations.  Rodriguez argues that the trial court erred by imposing this condition because the court did not make findings required by RCW 9.94B.080, and Rodriguez's mental health did not relate to his offenses as required by RCW 9.94A.703(3)(d).  He contends that we should remand for the trial court to strike the condition.  The State "agrees the court did not make the findings required by RCW 9.94B.080," but reasons that "the appropriate remedy is remand for consideration of the mental health condition under applicable standards."  Br. of Resp't at 68.

It is true that RCW 9.94B.080 provides that a trial court must find "reasonable grounds" to believe that a defendant is mentally ill "and that this condition is likely to have influenced the offence" before ordering a mental status evaluation and treatment.  But chapter 9.94B RCW applies only to crimes committed before July 1, 2000.  RCW 9.94B.010(1).  There is no allegation that any of Rodriguez's crimes were committed before 2004.  Thus, RCW 9.94B.080 is inapplicable to this case.

Instead, the relevant statute is RCW 9.94A.703(3)(d), which gives a trial court discretion to order a defendant to "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community."  It is not apparent that Rodriguez's PTSD related to the circumstances of the offenses, his risk of reoffending, or community safety.  Because we are

already remanding on other grounds, on remand the trial court should determine whether it is appropriate to order a mental health evaluation under RCW 9.94A.703(3)(d).

CONCLUSION

We remand for the trial court to correct the community custody term for both rape of a child in the third degree counts to comply with the statutory maximum. On remand, the trial court should determine whether it is appropriate to order a mental health evaluation under RCW 9.94A.703(3)(d). We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, C.J.

We concur:

Glasgow, J.

Cruser, J.